**STATE of Missouri, Plaintiff–Respondent,**

v.

**Vincent E. DAVALOS, Defendant–Appellant.**

No. 25402.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 13, 2004.

Motion for Rehearing and Transfer to Supreme Court Denied Feb. 4, 2004.

Application for Transfer Denied
March 30, 2004.

Rebecca Kurz, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Lisa M. Eaton, Asst. Atty. Gen., Jefferson City, for Respondent.

NANCY STEFFEN RAHMEYER, Chief Judge.

Vincent E. Davalos ("Defendant") was convicted by the trial court of a class B felony of possession of a controlled substance with intent to deliver,[1] and sentenced to eight years imprisonment. Defendant timely filed this appeal in which he alleges that the trial court erred in denying his motion to suppress evidence. He contends that the search that produced the evidence used to convict him was not predicated on an objectively reasonable suspicion of criminal activity, violating his Fourth Amendment rights. Because we find that Defendant's confession at trial provides a separate basis for his conviction, we affirm the conviction.

In the light most favorable to the verdict, the facts adduced at trial are as follows: On January 28, 2002, Jose Granado ("Granado") and Defendant were traveling from Dallas, Texas to Memphis, Michigan. Granado had rented a Ford Ranger for the trip, and Defendant was traveling as Granado's passenger. Granado and Defendant were passing through Pemiscot County, Missouri, northbound on Interstate 55 at approximately 1:00 a.m. Trooper Stewart ("Stewart") of the Missouri Highway Patrol was observing traffic that early morning and saw the truck weave in its lane. Stewart followed the truck for approximately three miles at which point he observed the truck cross the centerline. He activated his overhead lights and siren

---

1. Section 195.211; All references to statutes are to RSMo 2000, unless otherwise indicated.

and Granado stopped the truck on the shoulder of the road. Stewart testified at trial that he did not identify the truck as having a Texas license plate until after he activated his overhead lights.

Stewart approached the truck and asked Granado if he was aware that he had crossed the centerline. Granado admitted that he had done so and apologized. Stewart asked for Granado's driver's license and vehicle registration and instructed Granado to accompany him back to his patrol car. While in the patrol car, Stewart ran a warrant check on Granado to see if the truck was stolen. He testified that Granado was much more nervous than the average person and was shaking so hard that he almost spilled his soda in the patrol car. Stewart also observed that Granado was having trouble speaking and that his breathing was labored.

Stewart then began to question Granado in more detail about where he was from and where he was going. Granado told him that he had rented the truck in Michigan, had traveled to Dallas, and was now returning to Memphis, Michigan; he informed Stewart that he worked for Taco Bell and had to be at work later that day; and he further stated that Defendant was his cousin from Dallas and that Defendant would be returning to Dallas by bus.

Steward returned to the truck to retrieve the registration paperwork. He talked to Defendant who appeared to avoid eye contact with Stewart and provided only short answers to the questions he was asked. Defendant told Stewart that they were headed to Capac, Michigan and that Granado would be driving him back to Dallas. Stewart noted on the truck's rental agreement that the truck had been rented in Texas and not Michigan as Granado had told him.

When Stewart returned to his patrol car and told Granado that there were discrep-ancies in the stories that Granado and Defendant were telling him, he observed that Granado grew more nervous. When asked about the truck being rented in Texas rather than Michigan, Granado told Stewart that a friend had driven him from Michigan to Texas where he had rented the truck. He also told Stewart that he had to be at work by the end of the week rather than the next day as he originally stated. Stewart then completed the computer checks on both Granado and Defendant, issued a written warning to Granado for crossing the centerline, and told Granado that he was free to go.

Granado exited the patrol car and approached the truck. Just as he was about to enter the truck, Stewart approached him and again informed Granado of the discrepancies in his statements and stated that he observed Granado to be very nervous. When Stewart asked Granado if he had any contraband on his person or in the truck, Granado denied it. After Granado refused permission for Stewart to search the truck, Stewart advised him that the vehicle was being detained so that a canine could be brought in to sniff the vehicle for contraband and that the truck could not be moved. He told Granado that he could wait in the patrol car if he wanted to and asked Defendant to step out of the truck and to stand in front of it until after the canine sniff was completed. Although Stewart testified that he told Granado and Defendant that they were free to leave the scene if they wished, both stayed at the scene and waited for the canine unit to arrive.

Sergeant Sanders ("Sanders"), a K–9 officer with the Missouri Highway Patrol, arrived at 1:15 a.m., approximately seven minutes after Stewart called for his assistance in the search. Sanders had his Missouri Highway Patrol canine with him that night to perform canine sniffs. Sanders

deployed the canine at three different locations to sniff the truck and the canine alerted to the left rear of the truck all three times. Sanders concluded that this was sufficient to indicate the presence of drugs in the truck and began to physically search the truck with Stewart.

Stewart and Sanders found a duffel bag that contained 16,620 grams [2] of marijuana. The duffel bag was in a locked luggage compartment in the back of the truck and contained no identifying clothing or papers with the drugs. When questioned by Stewart, Defendant stated that he had no knowledge of how the drugs came to be in the truck because the truck was already loaded when Granado arrived to pick him up.

In his sole point on appeal, Defendant claims that the trial court erred by denying his motion to suppress the duffel bag containing the marijuana. Specifically, Defendant argues that the marijuana was illegally obtained because Stewart did not have an objectively reasonable suspicion of criminal activity to detain him beyond the traffic stop. Defendant does not contest the initial stop for crossing the centerline; rather, he contests the subsequent detainment beyond the stop as an unlawful seizure.

"The standard of review when determining if a trial court properly ruled on a motion to suppress evidence is limited to a determination of whether there is sufficient evidence to support the court's ruling based on the complete record before the trial court." *State v. Slavin,* 944 S.W.2d 314, 317 (Mo.App. W.D.1997). It is immaterial whether evidence existed from which the trial court could have arrived at a contrary conclusion. *State v. Kampschroeder,* 985 S.W.2d 396, 398 (Mo.App. E.D.1999). The trial court may not be

reversed if its decision is plausible, even if we are convinced that we would have weighed the evidence differently if sitting as the trier of fact. *Id.* The facts are viewed in a light favorable to the ruling of the trial court, but the issue of whether the Fourth Amendment has been violated is a matter of law that we review *de novo.* *Slavin,* 944 S.W.2d at 317.

A seizure may occur if an officer "by means of physical force or show of authority" restrains the liberty of a citizen. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The test is whether a reasonable person, considering the totality of the circumstances, would feel free to leave, i.e. disregard police questioning and walk away." *State v. Manley,* 115 S.W.3d 398, 401 (Mo.App. S.D.2003). Common sense tells us that, as a rule, a motorist who is involuntarily stopped by a law enforcement officer will be reluctant to leave the scene until it is made clear that they are free to do so. *State v. Taber,* 73 S.W.3d 699, 706 (Mo. App. W.D.2002). The State is allowed to perform a routine traffic stop, a justifiable seizure under the Fourth Amendment, if it is based on a reasonable suspicion of criminal activity. *State v. Bradshaw,* 99 S.W.3d 73, 77 (Mo.App. E.D.2003). During a routine traffic stop the State is allowed to conduct a reasonable investigation of the violation which may include requesting a driver's license and vehicle registration, running a computer check, and issuing a citation. *Id.* Once a reasonable investigation of a traffic stop is completed, the motorist must be allowed to proceed on his way unless the State can provide an *objectively reasonable suspicion* that the individual is involved in criminal activity. *Id.* Any additional detention without reasonable suspicion of criminal activity may lead

---

**2.** This is equivalent to approximately 36.64 pounds.

to an unlawful seizure. *Id.* The reasonableness of any suspicion of criminal activity is determined by reviewing the totality of the circumstances. *State v. Day,* 87 S.W.3d 51, 55 (Mo.App. S.D.2002). Innocent factors may be added together to form reasonable suspicion of criminal activity. *Id.* The assessment of the officers actions is objective and not based on the officer's state of mind at the time of the stop. *Slavin,* 944 S.W.2d at 318.

In the present case, the trial court held an evidentiary hearing before trial at which Stewart testified as to why he detained Defendant beyond the initial stop. Stewart testified that he prolonged the stop because of the inconsistent stories he was told and Granado's unusual behavior; however, he also testified that he had expressly told Granado and Defendant that they were free to leave and that only the truck was being detained. Stewart testified at trial that nothing occurred during the interval between when he told Granado that he was free to go and when he detained the truck that would provide him with a reasonable suspicion of criminal activity. He testified that there were no specific facts that he could point to that would constitute a reasonable suspicion of criminal activity but stated he had a feeling that Granado was not acting right.

 Being nervous in and of itself does not lead to a reasonable suspicion of criminal activity, but it may be a factor, together with others, in considering the totality of the circumstances for reasonable suspicion to exist. *Slavin,* 944 S.W.2d at 320. Furthermore, the denial of permission for a consensual search may not be used as support for the necessary reasonable suspicion. *Id.* at 319. The State must be able to point to some articulable set of facts or fact on which to base its reasonable suspicion, and more than just a "inchoate and unparticularized suspicion or

'hunch'." *Day,* 87 S.W.3d at 54 (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

The inconsistencies that Stewart testified to included Granado's need to return to work at different dates, the origin of the rental vehicle, how Defendant would return to Dallas, and their destination in Michigan; however, if these inconsistencies were the basis for his reasonable suspicion of criminal activity, it would seem that Stewart would not have told Granado he was free to leave after the initial stop. It appears that Stewart decided that reasonable suspicion of criminal activity existed only after his request for a consensual search was denied. Additionally, it should be noted that once the truck was detained, Defendant and Granado were essentially stranded alongside an Interstate in the middle of the night, halfway between Texas and Michigan, with nowhere to go and all of their luggage detained. Whether they were truly free to go under these circumstances is debatable.

 Although the trial court's decision to deny the motion to suppress is questionable, we are compelled to find that the evidence of guilt sought to be suppressed was merely cumulative, because Defendant testified at trial that he alone knew about the marijuana and that he loaded the marijuana into the truck with the purpose of delivering it for sale in Michigan. Defendant's confession prevents us from providing any relief to Defendant's claim of error. Although it is troubling that Defendant may be forced to testify due to evidence that was obtained from a possible illegal search, this court has found that voluntary incriminating testimony renders illegally obtained evidence cumulative and results in harmless error. *State v. Pate,* 859 S.W.2d 867, 870 (Mo. App. S.D.1993) (citing *Motes v. United States,* 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed.

1150 (1900)); *see also State v. Gonzales,* 63 S.W.3d 317, 319 (Mo.App. S.D.2001); *State v. Patino,* 12 S.W.3d 733, 740 (Mo.App. S.D.1999); *State v. McDaniel,* 987 S.W.2d 444, 446 (Mo.App. S.D.1999).

In *Pate* we found it would be "trifling with the administration of the criminal law" to allow a defendant who freely confessed his crime under oath to subsequently have that testimony excluded because of a trial court error. 859 S.W.2d at 870 (quoting *Motes,* 178 U.S. at 471, 20 S.Ct. 993). Although we note that the *Motes* case was decided in 1900, prior to *Terry*[3] and its progeny, at this point if *Pate* is not to be followed, we believe it is the Missouri Supreme Court that must make that decision. The point is denied and the judgment is affirmed.

BATES, J., concurs.

SHRUM, J., concurs in result in separate opinion.

SHRUM J, concurring.

I concur in the result. As found by the majority opinion, *Motes v. United States,* 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900), *State v. Pate,* 859 S.W.2d 867 (Mo. App.1993), and the progeny of those cases are dispositive of this case. Because Defendant clearly and unequivocally confessed at trial to the crime charged, it is my view that those cases render unnecessary any analysis or opinion about the possible invalidity of the search.